## EXHIBIT A

### AFFIDAVIT OF DAVID X. O'NEILL

I, David X. O'Neill, being duly sworn, depose and state as follows:

1.      I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), in my seventeenth year of service.  I am presently assigned to the DEA's New England Field Division's Task Force One.  I am further assigned to the Logan Airport Task Force ("LATF") based at Logan International Airport in East Boston, Massachusetts.  The LATF is comprised of police officers from the Massachusetts State Police ("MSP") and special agents from Homeland Security Investigations ("HSI") and the DEA.  The mission of the LATF is to prevent the flow and transport of illegal narcotics and bulk United States currency related to the sale of narcotics using the resources of the participating law enforcement agencies.

2.      During my law enforcement career, I have participated in hundreds of investigations involving the distribution of controlled substances.  As a result, I am familiar with the methods, routines, and practices of individuals and/or drug trafficking organizations, involved in the sale, distribution, and trafficking of narcotics.  Based on my training and experience, and the experience of my fellow officers and agents, I know that drug traffickers handle large amounts of cash and use a variety of methods to hide this cash or to attempt to convert it into legitimate income.

3.      I submit this affidavit in support of a Complaint for Forfeiture *in Rem* against the following asset:

> $205,940 in United States currency seized from Jessie Valdez Jr. at Logan International Airport, East Boston, Massachusetts on February 20, 2013 (the "Currency").

4.      This affidavit does not contain all the information known to me and other law enforcement officers regarding this investigation, but only those facts sufficient to establish probable cause for forfeiture of the Currency.

5.      This affidavit is based upon my personal knowledge, as well as information provided to me by law enforcement personnel from the LATF involved in the investigation, and my review of records and reports relating to the investigation.

6.      As set forth below, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

I.    **The Investigation**

A.      **The Seizure of the Currency**

7.      On February 20, 2013, Jessie Valdez Jr. ("Valdez") was scheduled to fly on a one-way airfare from Boston, Massachusetts, to San Francisco, California, on JetBlue Airways ("JetBlue").  Law enforcement learned that Valdez purchased his one-way ticket shortly before his intended departure date.  Law enforcement also learned that Valdez had traveled to or from Boston on JetBlue 13 times in the period April 14, 2012, to January 12, 2013.  The flights to or from Boston were exclusively between Phoenix, Arizona, and Boston, or between Boston and San Francisco or Oakland, California.  The airline tickets for these trips were purchased on the same day or shortly before departure.  Law

enforcement discovered that Valdez has an Arizona driver's license and has residential addresses in Mesa and Phoenix, Arizona.

8.       Based on my training and experience, I know that Arizona and Northern California are and known sources of marijuana trafficked into the Northeast of the United States, including to Boston. The DEA has had a number of successful forfeitures of cash related to drug trafficking between Boston and the San Francisco area.

9.       DEA Special Agent Eugene DiFiore ("Special Agent DiFiore") and I, along with other members of the LATF began surveillance in the vicinity of Terminal C of Logan International Airport. At approximately 2:55 p.m., I observed Valdez exit a vehicle and approach the JetBlue Airlines skycap service directly outside of the terminal. A man and a woman, later identified as Ines Seferi ("Seferi") and her boyfriend, Kenneth Sullivan ("Sullivan"), were in the vehicle at the time. The man, Sullivan, appeared nervous and kept looking in my direction until the vehicle departed the area.

10.      I observed Valdez check two bags onto JetBlue flight 633 to San Francisco, California. While he was checking his bags, Valdez looked around nervously. After he checked his bags, Valdez entered Terminal C, walked around, and exited the terminal. He then walked to a different entrance and again entered Terminal C.

11.      Special Agent DiFiore and MSP Trooper John J. Morris ("Trooper Morris") went to the JetBlue bag room to locate the two bags that Valdez had checked. They identified a gray roll-a-way bag bearing tag number 8279982067, in the name of Jessie Valdez Jr. (hereinafter, "Valdez Bag 1") and a black "Ogio" bag bearing tag number 8279982075, in the name of Jessie Valdez Jr. (hereinafter, "Valdez Bag 2").

12.     Special Agent DiFiore requested that Trooper Morris and his drug detection canine, Rocky, perform an exterior scan of Valdez's checked bags.

13.     Rocky is a seven-year-old Labrador retriever, and was accredited for narcotic odor detection by the New England State Police Administrators Conference. In July of 2012, Trooper Morris and Rocky successfully completed and received their annual recertification. Previous positive alerts by Rocky have resulted in the discovery and seizure of illegal narcotics and bulk currency.

14.     Special Agent DiFiore arranged Valdez Bag 1 among four other randomly selected bags from the JetBlue baggage room. Trooper Morris and Rocky then conducted an exterior scan of the five bags. Rocky had a positive alert to the presence of narcotic odor from Valdez Bag 1. Special Agent DiFiore also arranged Valdez Bag 2 among four additional randomly selected bags from the JetBlue baggage room. Trooper Morris and Rocky then conducted an exterior scan of the second group of five bags. Rocky had a positive alert to the presence of narcotic odor from Valdez Bag 2. Rocky did not alert to any of the other bags in the JetBlue baggage room. Special Agent DiFiore then secured Valdez's two checked bags and informed me that Rocky alerted to the odor of controlled substances emanating from both of Valdez's checked bags.

15.     I located Valdez in the Transportation Security Administration ("TSA") passenger screening line in Terminal C.

16.     HSI Special Agent Robert Fisher ("Special Agent Fisher") and I approached Valdez and displayed our credentials. We asked Valdez if he would speak with us about his travel. Valdez agreed.

17.     Valdez stated that he arrived in Boston on February 18, 2013, two days prior, and had stayed with his friend and his friend's girlfriend. He declined to provide any additional information about his friend or where his friend lived.

18.     I informed Valdez that a drug detection canine alerted to both of his checked bags. In response, Valdez shrugged his shoulders and stated, "There shouldn't be any problem." When asked whether he had any drugs or weapons in his bags, Valdez stated that he did not. He later stated that there was "about $200,000" in cash in the bags.

19.     Shortly into our conversation, Valdez became extremely nervous. At one point during the consensual interview, he asked to sit down. I provided Valdez with a chair, but he did not sit in it. Instead, he seemed disoriented and walked around the chair before standing next to it with his hands in his pockets.

20.     When Valdez was asked why he was carrying such a large sum of money, he stated that the cash was his life savings, which he accumulated by working as a salesman for Kalil Bottling Company. He stated that he had an annual income of $40,000 as a salesman, which he reported on his taxes. He also admitted that he had been unemployed for approximately one year.

21.     Further investigation revealed that Valdez worked at Kalil Bottling Company from July 2005 until November 2011 and was paid a weekly salary of approximately $578, or no more than $30,000 per year. Valdez left employment with Kalil Bottling Company in November 2011 for "other employment."

22.     During the interview, Valdez spontaneously stated: "So what! I smoke weed! My friends smoked weed around the bag? So I am going to lose my money!" We

asked Valdez if he wanted to discuss the cash further, and he stated that he wanted an attorney. At that point, the interview ended.

23.     Valdez, his checked bags, and a black back-pack in his possession were transported to the MSP Troop F barracks in the airport. A Massachusetts State search warrant was applied for and approved for the three bags.

24.     While Valdez was at Troop F barracks, he was offered and received water and food and was at no time under arrest, held in a cell, or handcuffed. Because Valdez had terminated the interview at Terminal C, he was not interviewed at Troop F barracks.

25.     A search of the two checked bags revealed $188,240 in U.S. currency wrapped in denim jeans. The loose cash was stuffed into 14 pairs of jeans, ranging in size from a 33" waist to a 38" waist, and was not bound or bundled by elastics or money bands. A search of the backpack revealed an additional $17,700 in U.S. currency. More than 85% of the 8,881 bills found in Valdez's luggage were in $20 denominations. The total amount of U.S. currency found in Valdez's three bags was $205,940 (*i.e.*, the Currency).

26.     As Special Agent DiFiore, other investigators, and I counted the cash, we smelled a strong odor that we knew to be marijuana. We also smelled a perfume or scent emanating from the cash.

27.     Based on my training and experience, I know that drug transactions are cash transactions, and that the $20 denomination is a common denomination used in drug transactions. I further know that those involved with the illegal narcotics business may carry significant amounts of cash. When transporting cash used in drug transactions, individuals may use perfume such has Febreeze or dryer sheets to mask the odor of narcotics emanating from the cash. I further know that those who traffic in narcotics

6

often transport significant amounts of cash by air travel, as well as other methods of travel. Narcotics traffickers may make regular trips to and from source cities to transport payment for and proceeds of narcotics. These trips often involve use of one-way airfares, which may be purchased on short notice. In addition, based on my training and experience, I know that drug traffickers often utilize multiple cellular telephones in an effort to avoid detection by law enforcement.

**B.**     **Phone Records and Statements Regarding Valdez**

28.     When Special Agent Fisher and I approached Valdez near the TSA checkpoint in Terminal C, he was carrying an iPhone. Law enforcement learned that the phone number Valdez used to secure his flight reservation (480-272-5281, hereinafter "Valdez Phone Number 1") was a phone number that was previously used to contact David Dang ("Dang"). Valdez also used Valdez Phone Number 1 on a 2008 U.S. passport application. When LATF dialed that number on February 20, 2013, the iPhone Valdez had been carrying rang and displayed the phone number of the phone used by LATF.

29.     Dang was a target in a previous investigation by the DEA involving the distribution of more than 1,000 pounds of marijuana. This investigation led to the arrest and indictment of Dang on federal drug charges. *See United States v. David Dang*, Case Number 2:09-cr-00015, United States District Court for the Eastern District of Washington. On January 21, 2010, Dang pleaded guilty to one count of conspiracy to distribute more than 100 kilograms of marijuana. *See id.* At the time of his arrest on February 24, 2009, Dang was on probation in the Western District of Missouri as a result of an August 25, 2004, conviction on one count of conspiracy to distribute ecstasy. *See United States v.*

*David Dang*, Case Number 4:04-cr-00036-NKL, United States District Court for the Western District of Missouri.

30.     Law enforcement obtained telephone records for Valdez Phone Numbers 1 and 2.  Valdez Phone Numbers 1 and 2, in addition to the contacts with Dang as described above, were both used to contact others involved in narcotics trafficking.

31.     Valdez Phone Number 1 was registered in 2006 to Valdez's mother, Maria Teresa Valdez, at an address in Mesa, Arizona.

32.     Arturo Casados ("Casados") is Maria Teresa Valdez's brother and Valdez's uncle.  Casados is a known drug trafficker operating out of the Phoenix, Arizona, area.  In 2005, Casados pleaded guilty to distribution of marijuana and was sentenced to 108 months in prison.  Casados is known to have used a vehicle registered in Valdez's name.

33.     Upon receiving a receipt on February 20, 2013, for the seized Currency, Valdez asked whether "this" was about Casados.  He stated, "He is just my mother's brother."  When I asked Valdez if he wanted to talk about Casados and the assets Casados placed in Valdez's name, Valdez looked down and shook his head in the negative.

34.     Seferi is the registered owner of the vehicle used to transport Valdez to the airport on February 20, 2013.  On May 7, 2013, Special Agent DiFiore, Massachusetts State Trooper Sean Damato, and I interviewed Seferi.  During the interview, Seferi admitted that she and her boyfriend at the time, Sullivan, drove Valdez to the airport on February 20, 2013.

35.     At approximately 10:39 a.m., on February 20, 2013, phone number 774-212-2605 contacted Seferi's phone, and the conversation lasted approximately ten minutes.  According to Seferi, phone number 774-212-2605 is used by Sullivan.  Seferi's phone was in further contact with Sullivan at phone number 774-212-2605 approximately eight times on February 20, 2013, before the two were observed dropping Valdez off at the airport, including at 12:54 p.m., 1:17 p.m., 1:36 p.m., 1:37 p.m., and 2:09 p.m.

36.     In December 2012, Sullivan was arrested in Massachusetts on four marijuana-related charges, including conspiracy to distribute marijuana and possession with intent to distribute marijuana.  Those charges remain pending.

37.     Although Sullivan is unemployed, Seferi stated that he had recently purchased landscaping equipment in order to start his own business.  When asked how Sullivan paid for the equipment while unemployed, Seferi did not respond.

38.     When interviewed, Seferi provided law enforcement with multiple versions of the events leading up to the drive to the airport on February 20, 2013.  She first stated that she and Sullivan had been at a bar in Boston that afternoon, and that Valdez had "struck up" a conversation with them at the bar.  She later stated that Valdez was already talking to Sullivan when she arrived at the bar and that Valdez "might be" an associate of Sullivan's.  Seferi remembered that Valdez put his suitcases into the trunk of her car, but could not remember the name of the bar, where she parked her car, or how the suitcases got to the car.  Seferi estimated that she was at the bar with Sullivan for approximately one hour prior to driving to the airport.  When confronted with fact that she had texted and called Sullivan at the same time she claimed she was with him at the bar, she had no explanation.

9

39.     During our interview of Seferi, she appeared nervous.  She thought for a long time before answering specific questions, and a rash broke out on her neck.

### Conclusion

40.     Based upon the information set forth above, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. §881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.


Signed under the pains and penalties of perjury this 27 th day of June 2013.

David X. O'Neill, Special Agent
United States Drug Enforcement Administration